AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Western District of Texas

**FILED**
February 26, 2024
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: Cecie Rodriguez
DEPUTY

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| Omar Moreno | ) | EP:24-MJ 841 ATB |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **February 23, 2024** in the county of **El Paso** in the **Western** District of **Texas**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 201(c)(1)(B) | Bribery of public officials |

This criminal complaint is based on these facts:

See attached Probable Cause Statement hereby incorporated by reference as if fully restated herein:

☑ Continued on the attached sheet.

Complaint sworn to telephonically on February 26, 2024 at 1:27pm and signed electronically. **FED.R.CRIM.P. 4.1(b)(2)(A)**

Sworn to before me and signed in my presence.

Date: 02/26/2024

City and state: El Paso, Texas

*Complainant's signature*

Todd Petkus, FBI Special Agent
*Printed name and title*

*Judge's signature*

Anne T. Berton U.S. Magistrate Judge
*Printed name and title*

**PROBABLE CAUSE STATEMENT**

1. I, Todd Petkus, hereinafter referred to as affiant, am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and conduct investigations of violations of Federal Criminal Law, including bribery of public officials and witnesses.

2. This affidavit is submitted in support of an arrest of Omar Moreno ("MORENO") for violation of Title 18, United States Code, 201, bribery of public officials and witnesses.

3. On December 7, 2022, the investigating agents received information from two individuals who claimed they were smuggled into the United States via the Ysleta Port of Entry ("POE") in El Paso, located in the Western District of Texas, via a corrupt CBP officer. Through further investigation, the CBP officer was identified as MORENO. The witnesses described being escorted into the POE by another co-conspirator, given a code word by MORENO, and being escorted out of the POE, without inspection, by MORENO. They paid $16,000 (dollars) to be smuggled through the POE.

4. As part of the investigation, agents approached an identified member of the organization, who agreed to speak with and work for investigators as a Confidential Human Source ("CHS 1"). CHS 1 explained the smuggling organization. CHS 1 stated that a co-conspirator ("CC 1") – whom he/she knew as "Junior" – coordinated arrangements with MORENO to smuggle Undocumented Non-Citizens ("UNCs") through the Ysleta POE into the United States. CHS 1 explained that CC 1 charged approximately $7,000 per UNC. CHS 1 was not regularly paid by CC 1 for his/her role but was sometimes given $500 to assist in the operation. CHS 1 believed most of the money was split between CC 1 and MORENO, although he/she never witnessed MORENO being paid.

5. CHS 1 explained he/she was involved in the smuggling of approximately 10 people through the Ysleta POE over six to seven months. CHS 1 stated that during each incident MORENO was the CBPO who guided the UNCs through the POE without inspection. CHS 1 described an incident on February 1, 2024, where a UNC was smuggled into the United States using the above-described scheme. Agents obtained video of the event and reviewed it with CHS 1. CHS 1 pointed out MORENO and the UNC on video. CHS 1 explained how MORENO escorted the UNC out of the POE and how CC 1 was paid $7,000 by the UNC.

6. On February 23, 2024, agents observed MORENO leaving his home in El Paso, Texas and driving to the Ysleta POE in his CBPO uniform. MORENO arrived for his regularly scheduled shift at approximately 2 p.m. During this time, CHS 1 brokered a deal with CC 1 to cross two UNCs into the United States. The UNCs were in fact undercover officers ("UC") - UC 1 and UC 2. At approximately 2:40 p.m., UC 1 and UC 2 entered the Ysleta POE posing as UNCs. UC 1 and UC 2 were told to wait in the Passport Secondary Control (PCS) waiting area of Ysleta POE. UC 1 and UC 2 saw MORENO working in the PCS area of the POE. UC 1 and UC 2 sat down and were waiting for a few minutes when MORENO walked out into the waiting area. The CHS, UC 1, and UC 2 stood up and followed MORENO out of the PCS and exited the POE without being inspected.

7. Outside the POE at the phone booths, CC 1 was waiting in a pickup truck. The UCs and CHS entered the truck and CC 1 began to drive to the Academy Sports on Americas Boulevard. The vehicle was tracked by air and proceeded directly from the POE to the parking lot of the Academy Sports. During the drive, UC 1 and UC 2 heard CC 1 ask what their families did for work to pay for them to cross into the United States. Once there, UC 3, parked in a different vehicle, was waiting with payment. CC 1 parked next to UC 3's vehicle. The CHS, UC 1, and UC 2 got out of CC 1's truck and were approached by United States Border Patrol Agents. All of the individuals were apprehended on suspicion of alien smuggling and brought to the Ysleta Border Patrol Station on Pine Springs Drive in El Paso, Texas.

8. At the Border Patrol Station, CC 1 was advised of his rights and agreed to speak with agents in a recorded interview. CC 1 explained that he met with MORENO earlier in the day on February 23, 2024. MORENO asked CC 1 if he had, "something for today." CC 1 understood, "something for today," to mean crossing people from Mexico into the United States without paperwork. CC 1 indicated there were people to cross and MORENO told him to be ready by 2pm.

9. CC 1 drove with the CHS to the POE and dropped the CHS off. CC 1 waited at the phone booths while the CHS exited through the port towards Mexico. CC 1 waited for the UCs and CHS 1 to exit the POE and drove them to the Academy Sports. While questioning CC 1, investigators asked CC 1 what he thought the "illegals" he drove would say about what

happened. CC 1 did not correct investigators or make any statement to indicate he believed the UCs were from the United States. CC 1 told agents that the UCs were supposed to pay $10,000 (dollars) to be crossed. CC 1 would keep $2,000 (dollars) and MORENO would collect $8,000. According to CC 1, MORENO always collected $4,000 per person, per crossing. According to CC 1, he worked with MORENO to cross approximately 30 people into the United States since the beginning of the scheme. MORENO would have made approximately $120,000 for his part in the scheme.

10. Agents provided CC 1 with $8,000 in $100 bills, wrapped in an elastic band. The $8,000 was to be used to pay MORENO his bribe.

11. Later, at approximately 10:00pm, CC 1 was contacted by MORENO, indicating that MORENO would be waiting to receive payment near the Burlington store in Eastlake Marketplace. Law enforcement officers observed MORENO's truck departing his house and spotted his vehicle driving through the parking lot near the Burlington. MORENO drove through the parking lot slowly, weaving up and down the parking lot. MORENO parked for a few minutes before eventually changing the meeting location to the Peter Piper Pizza nearby.

12. Agents observed CC 1 meeting with MORENO. CC 1 parked near MORENO, exited his own vehicle and entered MORENO's. CC 1 and MORENO sat in MORENO's vehicle and CC 1 paid $8,000 for the smuggling event earlier that day.

13. Investigators then witnessed MORENO depart the meeting location and spotted him ordering food at the drive-thru of the nearby Panda Express. Agents approached MORENO and arrested him. MORENO's vehicle was seized. Prior to transporting the vehicle to the El Paso Federal Justice Center, Agents conducted a safety check of the vehicle and observed $8,000 in $100 bills wrapped in an elastic band in the vehicle.

14. Based on the above information, affiant believes there is sufficient probable cause that in the Western District of Texas, Omar Moreno did commit a violation of Title 18, United States Code, 201, bribery of public officials and witnesses.